Leona M. MIZE *v.* RESOURCE POWER, INC.
& Liberty Mutual Insurance Corporation

CA 06-1270                         .          261 S.W.3d 477

Court of Appeals of Arkansas
Opinion delivered September 5, 2007

C. *Michael White*, for appellant.

*Friday, Eldredge & Clark*, LLP, by: *Guy Alton Wade*, for appellee.

DAVID M. GLOVER, Judge. In this workers' compensation case, the administrative law judge determined that the left knee injury claimed by appellant, Leona Mize, was not a compensable injury because Mize sustained the injury while engaged in horseplay, not while performing employment services. The Commission affirmed and adopted this opinion as its own. Mize now appeals, arguing that the Commission's finding that she failed to prove that she was performing employment services at the time of her injury is not supported by substantial evidence, and that she was not engaged in horseplay at the time of her injury that would preclude a finding that she sustained a compensable injury. We affirm.

In *Stutzman v. Baxter Healthcare Corp.*, 99 Ark. App. 19, 23-24, 256 S.W.3d 524, 527 (2007) (citations omitted), this court set forth the well-settled standard of review for workers' compensation cases:

> When reviewing a decision of the Arkansas Workers' Compensation Commission, the appellate court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings and affirms that decision if it is supported by substantial evidence. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. The issue is not whether this court might have reached a different result from the Commission; the Commission's decision will not be reversed unless it is clear that fair-minded persons could not have reached the same conclusions if presented with the same facts. When a claim is denied because a claimant failed to show entitlement to compensation by a preponderance of

the evidence, the substantial-evidence standard of review requires that we affirm if the Commission's opinion displays a substantial basis for the denial.

Here, appellant was working through Resource Power, Inc., on a production line at Bosch Skil inserting motor brushes into the motor of saws. At the hearing, Mize testified that in the early morning hours of May 14, 2005, near the end of her shift, she was standing at her workstation, which she described as a "cubbyhole" about two feet by two feet. She said that Wesley Greenhaw was on her left, and Brenda Edmonds was on her right, and that they were working "elbow to elbow." Mize explained that she was required to keep her work area clean, and that when she had free time, she was to pick up her area if she could do so without getting behind. She said that workers were provided air hoses and brooms and dustpans for cleanup, and that they were not allowed to leave the work area without permission, even if they were caught up.

Mize testified that on the night of her injury, she had a free moment and was going to clean her work area. She said that a broom was leaning on the table directly behind her, and when she turned to her right to grab it, she felt a "popping" in her knee and she fell to the floor. She stated that no one noticed that she had fallen, and she had to hit Greenhaw's leg and grab his ankle to get his attention. Someone notified the group leader, who took Mize to the first-aid room in a wheelchair after she said that she could not get up. Mize was treated at the hospital emergency room in Heber Springs, where she was given crutches. She returned to light-duty work through June 2005, but she still had trouble with pain, instability, and swelling.

Mize eventually was seen by Dr. Robert Cowherd, a family physician, who ordered an MRI, which indicated a complete ACL tear. Mize was then referred to Dr. Dennis Luter, an orthopedic surgeon, who recommended physical therapy and ACL replacement surgery. The surgery was not performed when recommended because Mize did not have insurance, but she eventually underwent the surgery in November 2005. When Mize informed Resource Power that she was restricted to sit-down, light-duty work, she was told that she could not return to work. Mize said that she had not worked anywhere since leaving Resource Power and that she had not attempted to find work because she did not feel able to work.

Mize testified that she had done Tae Bo, an aerobic kick-boxing, in the past, but she denied doing Tae Bo on the night of her injury. She said there was not enough space to do a kickboxing demonstration at her work station even if she had wanted to, because she could not kick her leg completely out, which would have required, in her estimation, about five feet. Mize testified that she never danced while she was working on the line, and that at the time of her injury, she was not doing any type of dance step or kick. She reiterated that there was not enough room to do any type of kick or dance step.

On cross-examination, Mize said that she did not slip and fall; that the floor was not slick; that her shoe did not lose traction; and that there was nothing unusual about her work station that night. She said that she was not taking any medication for her knee and that she was not wearing a knee brace. She stated that at the time she fell, she was turning to get a broom that she needed to perform her employment duties. Mize said that she talked to Brenda Edmonds about Tae Bo and was going to loan Edmonds her video tapes. She stated that she was not paid to do aerobics, dancing, or Tae Bo. Although she denied that she was dancing or doing Tae Bo, she asserted that even if she had been doing one of those, she was still entitled to benefits because she was performing an employment duty.

Wesley Greenhaw, who appeared at the hearing pursuant to a subpoena and no longer worked at Bosch Skil, testified for appellees that he was employed by Resource Power and assigned to Bosh Skil at the time of Mize's accident. He said that he worked beside Mize, but he described the work area as a "big space" or a "hallway" between Mize and himself that was more than eight feet, and he said that the space was big enough for someone to step back from the line. Greenhaw stated that there was not a broom behind Mize at the time of her injury, that the brooms were kept in a hallway away from the line. Greenhaw testified that prior to the date of the injury, he had noticed Mize wearing a knee brace, and that she told him that she was wearing it because her knee was hurting. He said that Mize also told him that she was taking some type of medication, and when she pulled her knee brace down, that her knee was black and blue.

Greenhaw testified that near the end of shift on May 14, Mize started dancing and throwing her leg up in the air, and that she fell the last time she threw her right leg up. Greenhaw said that Mize was trying to kick her leg as high as she could, and that she

was kicking toward him when she fell. Greenhaw testified that Mize was not working on the line when she fell, that she had backed away; he said that he thought she just kicked too high and lost her balance. Greenhaw stated that sometimes the employees would "sing and carry on" and that they would dance on the line.

On rebuttal, Mize stated that she had no idea why Greenhaw testified as he did, but that on the night of her injury, he had made some comments about her rear end and was laughing about her and her body. Again, she denied that she was doing kicks that night; that there was no room for her to do kicks; and that if she had kicked, she would have kicked Greenhaw. She repeated that brooms were kept in various locations on the line.

In denying Mize's claim, the Administrative Law Judge specifically found Greenhaw's version of the events more believable, or more credible, than the version of events related by Mize. The ALJ further found that Mize was not forthcoming about the condition of her left knee, noting that Greenhaw testified that she had made previous complaints about that knee, was taking medication in relation to the knee, and was wearing a brace on that knee. The ALJ further found that Mize was actively engaged in horseplay at the time her injury occurred.

The ALJ also addressed Mize's alternative contention that even if she was performing some type of dance step or kick, she was still performing employment services under the approach set forth in *Ringier Am. v. Combs*, 41 Ark. App. 47, 849 S.W.2d 1 (1993), which treats an injury resulting from horseplay as a "course of employment" rather than an "arising out of employment" problem. Mize argued that minor acts of horseplay did not automatically constitute a departure from employment but rather may be found to be insubstantial. Appellees argued that *Ringier* has no precedential value because the Arkansas Legislature rewrote the workers' compensation law after that case was decided and added a specific prohibition that injuries caused by horseplay shall not be considered compensable.

The ALJ, citing *Ringier*, stated:

> Whether initiation of horseplay is a deviation from one's course of employment depends on: (1) the extent and seriousness of the deviation; (2) the completeness of the deviation, *i.e.*, whether it was co-mingled with the performance of duty or involved in abandonment of duty; (3) the extent to which the practice of

horseplay had been an accepted part of the employment; and (4) the extent to which the nature of the employment may be expected to include some such horseplay.

Using these standards, the ALJ found that there was a complete deviation from the job Mize was contracted to perform when she chose to demonstrate an aerobic exercise for a co-worker. The ALJ further found that Mize admitted that she had stopped working on the assembly line at the time the alleged injury occurred, and that performance of an aerobic exercise was not part of Mize's job duties. The ALJ found that at the time of her alleged injury, Mize "was involved in nothing required by her employer and was doing nothing to carry out the employer's purpose."

On appeal, Mize first argues that she presented credible evidence as to how her injury occurred, and that her description is consistent with the history found in her medical reports. She argues that Greenhaw's description of the events surrounding the injury is totally implausible and should be disregarded by the Commission and this court. Mize also argues that Greenhaw's statements about her having previous knee problems should be ignored because there was no other evidence in the record that indicated that she had ever experienced any problems with her left knee prior to May 14, 2006.

■ The short answer to this argument is that it is the Commission's province to determine witness credibility and the weight to be given to each witness's testimony. *Johnson v. Riceland Foods*, 47 Ark. App. 71, 884 S.W.2d 626 (1994). In this case, the ALJ, and the Commission by affirming and adopting the ALJ's opinion, found that Greenhaw's version of the events was more credible than Mize's version. This argument presents no basis for reversal.

■ Mize next argues that she was performing employment services at the time of her injury because she was cleaning her work area and because she remained in her work area. However, as explained above, the Commission did not believe Mize's testimony that she was reaching for a broom when she fell; rather, it believed she was performing an aerobic exercise, which was not related in any way to her job duties. Simply because a person is physically present in an assigned work area when the injury occurs does not mean that the person is performing employment services. In this case, although Mize was present in her work area at the time

of her injury, the Commission found that she was engaged in horseplay at the time of her injury and was not performing employment services.

Mize's last argument is that she was not engaged in horseplay at the time of her injury that would preclude a finding that she sustained a compensable injury. In support of her argument, Mize cites *Morales v. Martinez*, 88 Ark. App. 274, 198 S.W.3d 134 (2004), and *Ringier, supra*. She cites *Morales* for the proposition that "horseplay" has not been defined by statute or case law, except to note that its meaning is synonymous with "skylarking" or "rough or boisterous play." She cites *Ringier* for the aspects considered in determining whether horseplay is a deviation from one's course of employment, as set forth above.

We do not find *Ringier* to be controlling because it dealt with a 1991 workers' compensation injury, which was prior to the revision of the workers' compensation laws in 1993. Arkansas Code Annotated section 11-9-102(4)(B)(i) (Repl. 2002) provides that "compensable injury" does not include injuries caused by horseplay, except for innocent victims. This statutory provision was enacted after the *Ringier* case was decided and is controlling in the present case.

In this case, as in *Morales*, it was Mize's burden of proof to show that she was not engaged in horseplay at the time of her injury. Given the evidence, and the fact that the Commission determined that Greenhaw's testimony was more credible than that of Mize, we hold that there was substantial evidence to support the Commission's determination that Mize was engaged in horseplay at the time of her injury, when she demonstrated some type of kicks or aerobic exercise, which was not performance of employment services.

Affirmed.

ROBBINS and BAKER, JJ., agree.